THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANCISCO J. GONÉ, Defendant-Appellant.

Third District   No. 3—04—0938

Opinion filed August 13, 2007.

McDADE, J., concurring in part and dissenting in part.

Stephen Omolecki, of State Appellate Defender's Office, of Ottawa, for appellant.

James Glasgow, State's Attorney, of Joliet (Lawrence M. Bauer and Thomas D. Arado, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court.

A jury found defendant Francisco J. Goné guilty of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 2000)), and, in a simultaneous bench trial, the court found him guilty of unlawful possession of a weapon and unlawful possession of ammunition by a

felon (720 ILCS 5/24—1.1(a) (West 2000)). Defendant was sentenced to concurrent prison terms of six years for aggravated discharge and four years each for the unlawful possession convictions. Defendant appeals, arguing that (1) he was denied his right to due process when he was required to wear a stun belt at trial without a prior "manifest necessity" hearing; and (2) plain error resulted when the court misinstructed the jury as to how it was to consider identification evidence. We affirm.

## BACKGROUND

Defendant was charged in six counts with offenses arising out of a drive-by shooting committed in Lockport, Illinois, on the evening of July 3, 2000. Prior to trial, the State nol-prossed a charge of aggravated unlawful use of a weapon in street-gang activity, and defendant waived his right to a jury on counts charging unlawful possession of a weapon and ammunition by a felon. On September 8, 2003, the cause proceeded to a bench trial on the possession charges and a simultaneous jury trial on aggravated discharge of a firearm and two counts of aggravated battery with a firearm.

At trial, witnesses for the State identified defendant as the front-seat passenger of a maroon Chevrolet Beretta from which gunshot was fired at a group of young men gathered outside of Andy Cerros' house. Cerros' girlfriend, Lisa Tarnowski, had just stepped out of the front door of the house when she saw the Chevrolet pull up in front of the garage where the young men were working on a car. She heard five or six shots, and then the Beretta proceeded by the house. Tarnowski said it was still light out. As she approached the sidewalk in front of the house, the passenger looked directly at her. She did not know him. She described the passenger as a male about 20 years old with short hair. On July 11, 2000, she viewed a photographic lineup and identified defendant as the man she had seen. Tarnowski also made an in-court identification.

Cerros testified that he was having a beer with friends after working on his friend's car when the maroon Beretta drove up and opened fire on them. He saw the flash of gunshot from the front passenger side of the car. He said five or six shots were fired, and some of them struck his cousin's car. He noted that both the passenger and the driver were male Hispanics. Later that evening, Cerros viewed a lineup. He saw a person that looked just like the front-seat passenger, but he did not positively identify him. On July 11, Cerros positively identified defendant from a photo array. Cerros also made an in-court identification of defendant as the front-seat passenger of the Beretta.

Cerros' cousin, George Torres, testified that he saw the maroon

Beretta approaching Cerros' house as he was getting ready to leave. He heard five shots fired from the car and saw that there were two persons in it. Torres jumped into his car and pursued the Beretta. When the Beretta stopped at a stop sign, Torres noted that the passenger wore his hair in a "shag," with a tail in the back. The Beretta then sped off, and Torres gave up the chase. Torres later found three bullet holes in his car.

Curtis Cooper testified that he was standing in the driveway at Cerros' residence with Cerros and his friends in the early evening of July 3, 2000, when a red Chevrolet Beretta drove up and shots were fired from the passenger side. He said the car was proceeding slowly by the house, and the two occupants of the car appeared to be male Hispanic, white or light-skinned African-American. Immediately after the shooting, Cooper noted that he had been hit in the right index finger. He jumped into his car to give chase; however, he saw that he was losing a lot of blood and drove himself to the hospital instead. A bullet was removed from his finger the following morning.

Cesar Ramirez testified that he was having a beer in the driveway of Cerros' house the evening of July 3, 2000, after his friends replaced the brakes on his car. When he heard gunshots, he threw himself to the ground. He said he heard about six shots, but he did not see where they came from. He was grazed on the right side of his body by a bullet, and he found a large bullet hole in the trunk of his car.

Angel Marcano testified that he was driving his mother's red Beretta on the evening of July 3, 2000. Between 8 and 11:30 p.m., he was in Lockport visiting his friends, Eddie Solis and defendant, at Solis' home. When Marcano left with defendant, defendant suggested they drive by Cerros' house to yell gang slogans at him if he was there. Marcano said he slowed the car as they approached Cerros' house, and then defendant pulled out a handgun and started firing out the passenger-side window at the men standing there. Marcano said he was a member of the Two-Six street gang on the day of the shooting. He was arrested for the offense on July 10 and subsequently pleaded guilty to aggravated discharge of a firearm for his part in the incident.

The State's witnesses identified Marcano's vehicle as the maroon or red Beretta from which the shots were fired. Jeremy McElroy, another member of the Two-Six gang in July 2000, testified that he told the police in July 2001 that defendant fired a .380-caliber automatic during another drive-by shooting on July 9. Forensic evidence established that spent .380-caliber automatic projectiles recovered from the July 3 incident were fired by the same weapon used in the July 9 shooting.

After the State rested, defendant presented an alibi defense.

Defendant's fiancée, Carissa White, testified that defendant and his friends were at her mother's house for a birthday party for Talesa, their two-year-old daughter, the evening of July 3, 2000. After the party, around 10 p.m., she, defendant and Talesa left her mother's house and drove to defendant's mother's house, where they spent the night. Carissa said they rented chairs for the guests from Joliet Rental, and she thought they returned them a few days later.

Corroborating testimony was provided by defendant's mother, Flor Martinez; Carissa's mother, Percie Jean White; Carissa's sisters, Charlene and Kimberly Thigpen; defendant's friend, Jose Ortiz; and Carissa's friends, Keisha and Kristal Weeks. Carissa's mother testified that defendant was wearing a "shag" hairstyle—short with a little tail—on the day of the party. Kimberly testified that Jeremy McElroy, who also attended the party on July 3, wore the "shag" hairstyle as well. She said it was the trend at the time. On cross-examination, Kimberly admitted that she was interviewed by the police on July 14, 2000, regarding Carissa's whereabouts. She did not recall telling the investigator that Talesa's birthday party was held on July 2.

In rebuttal, Will County sheriff's investigator Bradley Wachtl testified that, when he interviewed Kimberly on July 14, 2000, she told him that the birthday party at her mother's house was held on July 2, 2000. The State also introduced Malissa Kanive, manager of the equipment rental business from which defendant had rented the chairs for Talesa's birthday party. Kanive testified that the company's records showed that defendant picked up the chairs at 12:53 p.m. on July 1, 2000, and returned them at 12:45 p.m. on July 3.

In closing arguments, the prosecutor argued that Lisa Tarnowski clearly and unequivocally identified defendant as the July 3, 2000, shooter. He stated:

> "When you weigh the identification testimony of a witness, you should consider all of the facts and circumstances in evidence. That means when you look at the identification, you've got to look at everything and not just the parts, including but not limited to the following: the opportunity the witness had to view the offender at the time of the offense; the witness's degree of attention at the time of the offense; the witness's earlier description of the offender; the level of certainty shown by a witness when confronting the defendant."

Following their deliberations, the jury found defendant guilty of aggravated discharge of a firearm and not guilty of two counts of aggravated battery with a firearm. The court found defendant guilty of unlawful use of a weapon and ammunition by a felon.

Prior to sentencing, defendant moved for a new trial on the ground

that his right to due process of law was violated, because he was forced to wear a stun belt and the court had not taken affirmative action to consider whether there was a manifest need for the restraint. At the hearing on the motion, defendant's attorneys testified that the restraint around defendant's waist created an obvious, block-like protrusion under his shirt. The State presented security officers who testified that it was a standard policy in the Will County courthouse to place stun belts around defendants during felony trials. However, to the witnesses' knowledge, no stun belt had ever been activated while it was being worn by a defendant.

Before ruling on defendant's motion, the court made note of certain observations that it had made during defendant's trial: defendant was charged with crimes of violence, and he had a prior felony conviction involving a weapon; he had absented himself from the state of Illinois for more than two years following the shooting; he was young and appeared physically fit; the offenses were possibly related to gang rivalry; witnesses testified in court wearing their gang colors; and, due to a brief altercation between witnesses waiting in the hallway, the court had had to enter an order to keep them apart.

The court also noted that defendant had been polite and respectful of the court during the proceedings; he sat at counsel table between his attorneys; he stood, sat and walked without difficulty; the stun belt was not noticeable under the loose-fitting shirt defendant wore; he had not complained prior to or during trial about the device; and it did not appear that he had any difficulty communicating with his attorneys. The court concluded that any prejudice to defendant resulting from the use of the stun belt during the trial was outweighed by the court's pretrial security concerns. Accordingly, the court denied defendant's motion.

Defendant was subsequently sentenced, as aforesaid, and he appeals.

## ISSUES AND ANALYSIS

### 1. Stun Belt

Defendant contends that the court's posttrial rejection of his claim of a due process violation resulting from use of a stun belt was an abuse of discretion.

■ In *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977), our supreme court ruled that, before shackling is used on a defendant at trial, the court should consider whether there is a manifest need for restraints. Relevant factors to be considered include: the seriousness of the charge against the defendant; his temperament and character; his age and physical attributes; his past record; any past escapes, at-

tempted escapes, or plans to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of violence or attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the availability of alternative remedies. *Boose*, 66 Ill. 2d 261, 362 N.E.2d 303. If the court concludes that a defendant may try to escape, pose a threat to the safety of courtroom occupants or disrupt the order in the courtroom, shackling may be ordered. *Boose*, 66 Ill. 2d 261, 362 N.E.2d 303. The court's determination that there is a manifest need to use shackles will not be disturbed on review absent an abuse of discretion. *Boose*, 66 Ill. 2d 261, 362 N.E.2d 303; *People v. Buss*, 187 Ill. 2d 144, 718 N.E.2d 1 (1999).

■ It is now well settled that requiring a defendant to wear a stun belt without conducting a *Boose* hearing is a due process violation. *People v. Allen*, 222 Ill. 2d 340, 856 N.E.2d 349 (2006). This court has held, however, that the failure to conduct a pretrial *Boose* hearing may be remedied by a retrospective hearing, in which the parties' arguments are presented and the court places its reasons for requiring restraints in the record. *People v. Johnson*, 356 Ill. App. 3d 208, 825 N.E.2d 765 (2005); see also *Buss*, 187 Ill. 2d 144, 718 N.E.2d 1 (no error found where defendant made a pretrial objection to the use of shackles and *Boose* hearing was not conducted until the issue was presented in a posttrial motion).

■ In this case, the record shows that the court fully heard the parties' evidence and arguments when the issue was first presented for the court's consideration in a posttrial motion. Accordingly, we will apply a deferential standard of review to the trial court's denial of defendant's motion. See *Johnson*, 356 Ill. App. 3d 208, 825 N.E.2d 765; *Buss*, 187 Ill. 2d 144, 718 N.E.2d 1. Under the abuse-of-discretion standard, a trial court's decision will not be disturbed unless it is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359, 808 N.E.2d 496 (2004).

The court's decision in this case was supported by no less than five valid considerations for requiring a defendant to be restrained: (1) defendant was charged with serious crimes of violence; (2) he was young and physically fit; (3) he had a prior record of violence; (3) he presented a possible escape risk, in that he had eluded arrest for two years following the incident for which he was on trial; (4) because of gang involvement, a risk of further violence or revenge was presented; and (5) the mood of some of the witnesses attending court was volatile, requiring court intervention. See *Boose*, 66 Ill. 2d 261, 362 N.E.2d 303.

The court also considered that the stun belt was worn under a loose-fitting shirt, and it was not obvious to the jury or others that defendant was wearing it. Moreover, there was no indication that defendant had trouble communicating with counsel while wearing the device or that it hindered his movement.

Although the trial court acknowledged that some of the *Boose* factors weighed in defendant's favor, the court reasonably concluded that factors justifying the use of a restraining device outweighed any prejudice to him. Based on this record, we cannot say that the court abused its discretion in denying defendant's posttrial challenge to the use of a stun belt. See *Johnson*, 356 Ill. App. 3d 208, 825 N.E.2d 765; *Buss*, 187 Ill. 2d 144, 718 N.E.2d 1.

## 2. *Jury Instruction*

■ Next, defendant contends that he is entitled to a new trial, because the jury was improperly instructed on the reliability of eyewitness identification testimony (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000)). Defendant claims that, although he did not object to the instruction, plain error resulted because the evidence was closely balanced.

The written jury instruction read as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense.

or

The witness's degree of attention at the time of the offense.

or

The witness's earlier description of the offender.

or

The level of certainty shown by the witness when confronting the defendant.

or

The length of time between the offense and the identification confrontation."

In *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005), the court ruled that the use of "or" between the factors in this instruction was ambiguous and misleading, because the jurors might have believed that any one factor, but not all five, could be considered in evaluating the reliability of identification testimony. In *Herron*, as here, defense counsel failed to raise the jury instruction issue error in the trial court. As a general rule, a defendant's failure to properly preserve an issue with a contemporaneous objection and inclusion of it in a post-

trial motion forfeits the issue for review. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). The *Herron* court ruled, however, that the faulty instruction resulted in plain error, entitling the defendant to a new trial, when he established prejudice because the evidence was "so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 479.

The seriousness of the risk that an instruction error resulted in prejudice depends on the quantum of the State's evidence of the defendant's guilt. *Herron*, 215 Ill. 2d 167, 830 N.E.2d 467. In this case, unlike *Herron*, defendant has not shown that the evidence of his guilt was so closely balanced that prejudice might have resulted from the erroneous jury instruction. Three eyewitnesses positively identified defendant as the passenger in the car from which shots were fired from the passenger side on July 3, 2000: Angel Marcano, defendant's accomplice; Andy Cerros, the intended victim of gang harassment; and Lisa Tarnowski, who had no prior association with defendant. The witnesses' descriptions of the passenger were generally consistent and resulted in a positive identification of defendant within eight days of the incident.

Tarnowski's identification testimony was particularly certain and compelling. She was not in the line of fire, and, among the young people at the Cerros residence, she had the best opportunity to pay close attention to the passenger's face. There was no indication that Tarnowski had any motive to misidentify defendant. In addition, the State presented ample other evidence linking defendant to the crime and impeaching the credibility of his alibi witnesses. Our analysis of the circumstances in this case is in conformity with the factors listed by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), for assessing the reliability of identification testimony. See also *People v. Piatkowski*, 225 Ill. 2d 551 (2007).

On this record, we cannot say that the evidence of guilt was close or that the jury's verdict might have been affected by the erroneous written instruction. Therefore, we hold that defendant is not entitled to relief under the plain error doctrine.

## CONCLUSION

The judgment of the circuit court of Will County is affirmed.

Affirmed.

SCHMIDT, J. concurs.

JUSTICE McDADE, concurring in part and dissenting in part:

The majority have affirmed the judgment of the Will County circuit court convicting the defendant, Francisco Goné, of aggravated discharge of a firearm. In affirming, they rejected Goné's claims that (1) he was denied due process when he was required to wear a stun belt without a prior "manifest necessity" hearing, and (2) plain error resulted from the court's erroneous instruction to the jury, and his request for a new trial.

On the issue of the jury instruction, the majority agree that the instruction given by the court was, in fact, erroneous, but, relying on the supreme court's reasoning in *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005), find that there was not plain error because the evidence was not so closely balanced that the mistake "severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 479. Because I believe that the evidence against the defendant is not closely balanced and that the pertinent supreme court decisions compel our rejection of this claim by defendant, I concur.

I do not, however, believe *People v. Allen*, 222 Ill. 2d 340, 856 N.E.2d 349 (2006), compels our rejection of the stun belt claim. For that reason, I dissent on that issue.

In *Allen*, the supreme court placed a significant element of the burden of ensuring a fair trial not on the court and the attorneys— where, in my opinion, it clearly belongs—but on the defendant, and has thereby created a trap for the unwary and the procedurally ignorant. Thus, if the defendant or his attorney is not savvy enough to buck the "policy" of putting stun belts on all felony defendants by raising a specific objection in court, he has "waived" what the supreme court has recognized as a clear constitutional due process violation. Despite that aspect of its holding in *Allen*, the court has also told us that a defendant who is shackled during trial *without justification* has not only been deprived of due process, he has also been denied a fair trial.

The trial judges of this district have long known that due process requires a *Boose* hearing *before* a prisoner can be shackled (or otherwise restrained) for his trial because the supreme court told them so 30 years ago. *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977). Despite this knowledge, we get case after case where trial courts reject the supreme court directive in favor of acceding to the internal policy of some sheriffs to put stun belts (or other restraints) on all felony defendants. Our responses to what I believe to be a clear dereliction on their parts has been to reward them with tortured, internally inconsistent decisions that exculpate their wrongful conduct.

This court has found—and continues to find—that a retrospective hearing is sufficient to vindicate a wrong that *has already happened*, knowing full well that a court that has deliberately violated *Boose* will find some way to justify its failure to actually evaluate, before trial, the need for the defendant to be shackled. To do otherwise necessitates the expenditure of the time, effort, and money to ensure the defendant will receive a fair and constitutionally sufficient trial.

This case is a perfect example. The trial court found—*post* trial and *post* due process deprivation—that because the defendant was *charged* with a serious offense (although he was still presumed innocent of that offense when the trial began), because he was young and physically fit, because witnesses outside the courtroom (of whom the defendant was not one) were volatile, because he had eluded capture for two years, it was reasonable to believe that he would try to escape or would endanger persons in the courtroom during the trial. He, therefore, needed to wear a stun belt.

In point of fact, the defendant was, as the trial judge expressly acknowledged, "polite and respectful of the court during the proceedings; he sat at counsel table between his attorneys." 375 Ill. App. 3d at 391. It makes no difference that "he stood, sat and walked without difficulty; the stun belt was not noticeable under the loose-fitting shirt [he] wore; *** and it did not appear that he had any difficulty communicating with his attorneys." 375 Ill. App. 3d at 391. It is still the law of Illinois as articulated by our supreme court that if a defendant is shackled during trial without justification, his right to a fair trial has been denied (*People v. Allen*, 222 Ill. 2d 340, 346, 856 N.E.2d 349, 353 (2006); *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005); *In re Staley*, 67 Ill. 2d 33, 37, 364 N.E.2d 72 (1977)), and he must be retried. There is nothing in defendant's trial conduct to suggest that the stun belt was ever necessary and that he was not restrained without justification.

It is, I think, a fair inference that the trial court did not even consider, prior to trial, whether the defendant was being properly restrained. It simply did what the supreme court forbade in *Boose* and permitted defendant to be restrained at trial without a prior determination that such restraint was necessary. It also did what we forbade in *People v. Martinez*, 347 Ill. App. 3d 1001, 808 N.E.2d 1089 (2004), and blindly complied with the "standard policy" of the Will County sheriff to place stun belts on defendants in felony trials, thereby allowing someone other than the judge to dictate the constitutional propriety of defendant's trial. It is also wholly irrelevant, based on the supreme court's analysis in *Allen*, that "no stun belt had ever been activated while it was being worn by a

defendant." 375 Ill. App. 3d at 391. The "evil" to be avoided is standing unnecessarily restrained at trial in violation of due process and of the presumption of innocence, not merely receiving a shock—unpleasant and potentially lethal as that may be. I believe that the supreme court's analysis in *Allen* authorizes reversal of defendant's conviction under the particular facts of this case.

Having said all of this, I would also suggest that the root of this problem that we confront time and time again is the current "standard policy." I believe the procedural aspects of all these cases could be eliminated with a simple policy change—a change that is consistent not only with *Allen*, 222 Ill. 2d 340, 856 N.E.2d 349, but also with *Boose*, 66 Ill. 2d 261, 362 N.E.2d 303, *Herron*, 215 Ill. 2d 167, 830 N.E.2d 467, and *Staley*, 67 Ill. 2d 33, 364 N.E.2d 72, and our decision in *Martinez*, 347 Ill. App. 3d 1001, 808 N.E.2d 1089. The policy I propose enforcing is that every defendant steps into the courtroom without restraints unless the sheriff or the State specifically requests leave of court to restrain him or her. The required response to this request should be a *Boose* hearing at which the State bears the burden of proving to the satisfaction of the court that the defendant poses a danger that warrants his being restrained. That procedure is both inherent in and explicitly articulated and implicitly mandated by the cases cited above.

Such a policy is fully compliant with the federal and state constitutions and prior validated supreme court precedent, comports with general notions of fairness in the courts, and does not violate *Allen*. It also has the benefit of obviating the need for highly suspect retrospective hearings on the propriety of having already denied defendant due process and the potential need for expensive and inconvenient retrials.

This court should direct the circuit court of Will County (and all of the courts of this district) to change whatever current policy is being followed that requires a defendant to be restrained at trial without a *Boose* hearing. We should not, however, need to do this since the supreme court has, in fact, already mandated such a policy. In *Allen*, the court stated:

> "Here, as in *Martinez*, the trial court never made a *Boose* analysis; it simply deferred to the judgment of the sheriff. We agree with the *Martinez* court that this abdication of the trial court's responsibility is not acceptable. 'The court must rigorously control its own courtroom procedures and, consistent with the mandates of due process, protect the rights of the parties and the public.' *Martinez*, 347 Ill. App. 3d at 1004. *Indeed, the type of policy adopted by the Will County sheriff, requiring all custodial felony defendants to wear stun belts while in court, was frowned upon by this court almost 30 years ago in Boose.*

398

' "*** *[T]he trial judge must make the decision to use physical restraints on a case-by-case basis.* The court cannot adopt a general policy of imposing such restraints *** unless there is a showing of necessity on the record. ***"' ' (Emphasis added.) *Boose*, 66 Ill. 2d at 268, quoting *People v. Duran*, 16 Cal. 3d 282, 293, 545 P.2d 1322, 1329, 127 Cal. Rptr. 618, 625 (1976)." (Emphasis added.) *Allen*, 222 Ill. 2d at 348-49, 856 N.E.2d at 354.

It seems abundantly clear to me that the supreme court has forbidden the exact policy on which the Will County court has relied to justify its failure to hold a *Boose* hearing for the purpose of making a determination of the need for restraint of defendant Francisco Goné. I believe it is our job to enforce that mandate by highlighting its existence to the circuit courts and sanctioning its violation.