ILLINOIS OFFICIAL REPORTS

*People v. Smith*, 2012 IL App (4th) 100901

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARNELL M. SMITH, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-0901 |
| Rule 23 Order filed<br>Modified Opinion filed on denial of rehearing | April 4, 2012<br><br>May 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the burglary of a restaurant was affirmed, notwithstanding the facts that the original complaint and information failed to allege that defendant entered the restaurant "without authority," since the information was amended prior to trial to add the missing element, the amendment was allowed in a manner "consistent with the orderly conduct of judicial business," a new preliminary hearing was unnecessary where probable cause to believe defendant's entry was unauthorized was established in the original preliminary hearing, defendant never requested a continuance or an opportunity to plead anew, he showed no prejudice as a result of the amendment, and the evidence was sufficient to establish his guilt beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 09-CF-508; the Hon. John W. Belz, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Duane E. Schuster, all of State Appellate Defender's Office, of Springfield, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert J. Biderman, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.

Presiding Justice Turner and Justice McCullough concurred in the judgment and opinion.

## OPINION

### I. BACKGROUND

#### A. The Criminal Complaint

A criminal complaint was filed on June 16, 2009. According to the complaint, signed and sworn to by a police officer, defendant committed burglary (720 ILCS 5/19-1(a) (West 2008)) on June 14, 2009, in that he "knowingly entered a building of George Seaver, d/b/a Lincoln Douglas Café, located at 312 E. Monroe, Springfield, Sangamon County, Illinois, with the intent to commit therein a theft."

The complaint said nothing, however, about entering the building "without authority," even though lack of authority was an element of burglary. See 720 ILCS 5/19-1(a) (West 2008) ("A person commits burglary when without authority he knowingly enters *** a building *** with intent to commit therein a felony or theft.").

#### B. The Preliminary Hearing

On July 2, 2009, the trial court held a preliminary hearing, in which the court considered whether there was probable cause to believe that defendant had committed an offense. See 725 ILCS 5/111-2(a) (West 2010). Only one witness testified in the preliminary hearing, a Springfield police officer, Ryan Maddox.

Maddox testified that, at approximately 1:36 a.m. on June 14, 2009, he and other police officers were dispatched to a burglary in progress at "Lincoln Herndon [*sic*] Café," 312 East Monroe Street. Reportedly, two people who worked at a bar called "Two Brothers" had heard the shattering of glass and had seen a man crawling through the bottom portion of the door of the café. They described the man as "a black male wearing a black shirt[ ] [and] black shorts with red writing on the shirt," and they last saw him walking north on the railroad tracks along Third Street.

Near Fourth and Cook Streets, two investigators with the Secretary of State Police detained a man who appeared to match the description. They saw fragments of glass on his

arm. The police showed this man to the witnesses from Two Brothers, and the witnesses said he was the one they had seen crawling out of the café. Maddox identified defendant, in court, as the man the witnesses had identified.

¶ 9 On the basis of Maddox's testimony, the trial court found probable cause to believe that defendant had committed an offense.

¶ 10 C. The Information

¶ 11 On July 2, 2009, the State filed an information charging defendant with burglary (720 ILCS 5/19-1(a) (West 2008)). The information read the same way as the complaint. It alleged that defendant committed the burglary on June 14, 2009, by "knowingly enter[ing] a building of George Seaver, d/b/a Lincoln Douglas Café, located at 312 E. Monroe, Springfield, Sangamon County, Illinois, with the intent to commit therein a theft."

¶ 12 Like the complaint, the information said nothing about entering the building "without authority." 720 ILCS 5/19-1(a) (West 2008).

¶ 13 D. The State's Pretrial Motion To Amend the Information

¶ 14 On September 20, 2010, immediately before *voir dire*, the State moved to amend the information by adding the phrase "without authority," so as to signify that defendant's entry of the Lincoln Douglas Café on June 14, 2009, was unauthorized.

¶ 15 Defense counsel objected to the proposed amendment, arguing it was untimely and therefore unfairly prejudicial to defendant. Defense counsel told the trial court: "We would object at this point and time. That is an element of the charge and an amendment at this late stage of the ballgame I believe is prejudicial to the Defendant and we would object."

¶ 16 The trial court overruled defense counsel's objection to the proposed amendment of the information. The court said: "All right, I am going to allow the amendment. I do think he was charged with Burglary. It is not a new charge. So, I will allow that. I do not see the prejudice to the Defendant at this time." At the prosecutor's suggestion, the court made a handwritten amendment to the information, adding the phrase "without authority" between the words "knowingly" and "entered." The judge initialed the insertion.

¶ 17 E. Evidence in the Jury Trial

¶ 18 The jury trial occurred on September 21 and 22, 2010. The testimony was substantially as follows.

¶ 19 1. *James Doss*

¶ 20 A Springfield police officer, James Doss, testified that, on June 14, 2009, around 1:30 a.m., he was dispatched to Lincoln Douglas Café, 312 East Monroe Street, in response to a report of a burglary. According to the dispatch, the suspect was a black man dressed all in black clothing, including a black T-shirt with red and white lettering on it.

¶ 21 When Doss arrived at the café, he saw that the bottom part of the glass to the front door

had been broken and pulled out of the door frame. The door was locked, and a sign on the door said the owner was out of town, at a funeral.

¶ 22    Doss lifted the broken glass of the door and crawled into the café. The floor was littered with glass shards. A couple of bills of United States currency, coins, and receipts also were on the floor. The drawer of the cash register had been pulled completely out of the register and thrown onto the floor, behind the counter. No one was in the café.

¶ 23                                    2. *George Seaver*

¶ 24    George Seaver was one of the owners of Lincoln Douglas Café, and he testified it was his and his partners' practice to leave enough cash in the cash register overnight to make change for twenties the next day. Typically, they left about $100 in the register, in fives and ones.

¶ 25    Seaver did not know defendant and never gave him or anyone else permission to enter the locked café in the early morning of June 14, 2009. Only Seaver and his partners were allowed to touch the money in the cash register.

¶ 26    In addition to currency, a Jamaican coin had been in the cash register: a gold-colored coin that looked like a medallion or token–a "trinket coin" with someone's portrait stamped on it. A customer had left this coin, apparently as a tip. Seaver did not know the denomination of the coin.

¶ 27    After the burglary, this Jamaican coin was missing from the cash register, along with the currency. Seaver and his partners looked under counters and everywhere but never found the Jamaican coin.

¶ 28    The prosecutor handed People's exhibit No. 25(a) to Seaver, and he testified it looked like the Jamaican coin that had been in his cash register. On cross-examination, Seaver admitted he could not say for sure that this was the selfsame coin; he could say only that it looked like the coin.

¶ 29                                    3. *Katie Maurer*

¶ 30    Katie Maurer testified that her boyfriend, David Hannah, was employed as a bartender at Two Brothers Lounge, in the 300 block of East Monroe Street. At about 1:30 a.m. on June 14, 2009, she was standing beside him on the sidewalk outside Two Brothers as he locked the place up. She had consumed probably two drinks between 10:30 p.m. and 1:30 a.m. She was facing East Monroe Street, and he had his back turned to the street as he locked the front door. Lincoln Douglas Café was almost directly across the street from Two Brothers.

¶ 31    Maurer saw a man walking down the other side of the street: a black man, balding or with very short hair, dressed in black sweatpants and a black shirt with red and white lettering on it. She assumed this man was wearing a FitClub shirt, because FitClub shirts had the same combination of colors. The man threw a brick-like object at the front door of Lincoln Douglas Café, and Maurer heard the sound of falling glass. Then the man stooped and entered the café. She told Hannah, " 'That guy just broke in.' " Hannah turned around but did not see anything.

¶ 32    Hannah's car was parked across the street, almost directly in front of the café. After hesitating a minute or so, Maurer and Hannah began crossing the street, toward Hannah's car. She walked behind Hannah because he was trying to protect her. With Hannah blocking her view, she did not see the man come back out of the café. But she saw the man walking west down the street, and it was the same man she had seen break into the café.

¶ 33    Maurer and Hannah got into the car, and she called the police. In her conversation with the dispatcher, she described the man as an African American wearing a black T-shirt with red and white lettering and black sweatpants with a thin white stripe. She did not tell the dispatcher that the man was short-haired or balding.

¶ 34    The prosecutor showed Maurer People's exhibit No. 19, a photograph of a black T-shirt decorated with an image of a red arrow and the word "bam" in white. Maurer testified that the shirt in the photograph looked like the shirt the man had been wearing, but she could not say this was the identical shirt.

¶ 35    Likewise, the most Maurer could say was that defendant–a balding black man whom she identified in court–looked like the man she had seen break into the café.

¶ 36                              4. *David Hannah*

¶ 37    As David Hannah was locking up Two Brothers, Maurer drew his attention to something, and he heard a shuffling sound as if someone were moving broken glass. He turned around but did not see anything. He finished locking up and then paused a while in front of Two Brothers, smoking a cigarette. When it appeared that the coast was clear, he and Maurer began approaching his car, a Humvee, which was parked across the street, almost directly in front of Lincoln Douglas Café. (From the vantage of someone standing in front of Two Brothers, the café was across the street and one door to the left.)

¶ 38    When Hannah reached about the middle of the street, he saw, through the windows of his Humvee, a man "pop up" in front of the café. The man walked west down East Monroe Street. Then, before turning the corner to go onto Third Street, the man looked back, and Hannah saw his face in the light of the streetlights. Hannah also noticed the man was wearing a black T-shirt with red and white lettering. Possibly, he also was wearing black sweatpants–but Hannah was not sure about that. The man headed south on Third Street.

¶ 39    Hannah and Maurer got into the Humvee, and Maurer telephoned the police. She gave the police the description that Hannah gave her.

¶ 40    Then they drove to another bar, The Alamo. While they were there, Hannah received a telephone call from the police. The police asked him to come to Fourth and Cook Streets and see if he recognized a man they had caught. Hannah and Maurer left The Alamo and drove to that intersection. Maurer remained in the car, and Hannah got out and looked at the man standing in the glare of the headlights of the squad cars. Hannah told the police this was the man he had seen pop up in front of the café. He identified defendant, in court, as the man.

¶ 41    From the time Hannah saw the man outside the café to the time he identified the man to the police, no more than 10 minutes elapsed, by his estimate.

¶ 42                                  5. *Kevin Gade*

¶ 43        Kevin Gade testified he was an investigator with the Illinois Secretary of State Police and that on June 14, 2009, around 1:30 a.m., he was patrolling in his squad car. Two other investigators, named Paxton and Spressor, were riding with him.

¶ 44        The Springfield police department announced on the radio that a burglary had occurred at Lincoln Douglas Café on East Monroe Street and that the suspect was a black male wearing black pants and a black shirt with red and white lettering. No more than a couple of minutes later, Gade and his colleagues spotted a man who appeared to match the description; he was walking south on Fourth Street, toward the YMCA. No one else was out. Gade reported on the radio that they had found a man who possibly matched the description. Gade identified defendant, in court, as the man they had seen.

¶ 45        While Gade was speaking with the dispatcher on the radio, Spressor got out of the squad car and asked defendant for identification. Gade also got out. Defendant could provide no photographic identification; he had only a social security card.

¶ 46        Spressor asked defendant where he had been. He replied he had been at work, at Augie's Restaurant. Spressor asked him what he did there. He answered that he took out the trash.

¶ 47        Defendant's breath smelled like liquor. Also, Spressor noticed glass particles, like glitter or snowflakes, sprinkled up and down defendant's arm. Gade saw these glittery particles, too, when Spressor commented on them. Spressor asked defendant about the glass dust. He did not answer.

¶ 48        While the Secretary of State Police were questioning him, defendant broke away and ran–and Gade's testimony seems inconsistent as to precisely when defendant ran. At one point in his testimony, Gade said that defendant ran just as soon as Spressor asked him about the glass dust. Further on in his testimony, though, Gade said that defendant ran when Spressor told him that, although they were not actually arresting him, they were going to put him in handcuffs and await the arrival of the Springfield police, who wanted to question him about something that had happened around the corner. Defendant pulled away, saying, " 'You're not going to handcuff me. I didn't do anything wrong,' " and he ran.

¶ 49        In any event, at some point in his encounter with the Secretary of State Police, defendant broke away and ran south, in the direction of the YMCA, before they could get the handcuffs on him. Gade ran after him and caught him by the shirt, and they both fell to the ground. Defendant lay facedown on the ground, with his hands against his chest. The Secretary of State Police had to spray him in the face with pepper spray in order to wrench his hands away from his chest and put the handcuffs on him.

¶ 50        Afterward, Gade noticed cash scattered on the ground, along the path of defendant's flight.

¶ 51                                  6. *Kimberly Bradley*

¶ 52        Kimberly Bradley was a forensic scientist–more specifically, a trace chemist–at the Illinois State Police forensic laboratory in Springfield. Her job, as a trace chemist, was to analyze debris, explosives, paint, glass, and "general unknowns."

¶ 53    Bradley identified People's exhibit No. 26 as a glass standard and People's exhibit No. 27 as a sealed container of clothing and boots. She had been given the assignment of determining whether there were any glass fragments on the clothing and boots that matched the sample of glass–the glass standard–in People's exhibit No. 26.

¶ 54    First, Bradley confirmed, by chemical testing, that the glass standard in People's exhibit No. 26 was indeed glass. Then she determined its color, glass type, thickness, refractive index, and density. Then, she scraped down the clothing with a spatula and picked in the treads of the boots, looking for glass. What appeared to be minute fragments of glass (among other debris) fell off the clothing and boots. (Because the clothing and boots had been packaged in a single container, People's exhibit No. 27, it was impossible to tell on which of the items a given fragment of glass had been deposited. The most one could say was that the glass fragments had been deposited on one of the items.)

¶ 55    Of all the apparent fragments of glass that fell off the clothing and boots and into the tin container, Bradley chose three of the larger fragments for closer scrutiny. After confirming that they were glass, she ruled out two of them because they were amber-colored whereas the glass standard was a light blue-green.

¶ 56    The third fragment of glass was the next largest. Although it appeared to be colorless, it actually was too small to ascertain its true color, even under a microscope. It also was too small, or too fragmentary, to examine its thickness and density. All Bradley could do was measure its refractive index, the extent to which it slowed down light. She found that this third fragment of glass had a refractive index similar to that of the glass standard.

¶ 57    The forensic laboratory had a database of "over 2,500 glass samples that had been submitted to the crime labs throughout the State, and all of their measurements [were] in that database." Judging by the database, the characteristics of the glass standard in this case (People's exhibit No. 26) made it an uncommon type of glass. Because the glass standard was an uncommon type of glass, Bradley was able to opine, to a reasonable degree of scientific certainty, that the glass standard and the third fragment had a "good probability of common origin."

¶ 58    Bradley drew a distinction between a "good probability" and a "high probability." On redirect examination, the prosecutor asked her:

    "Q. Can you make a determination of high probability with only a refractive index test?

    A. No. With only one measurement–regardless of what you find in the database, with only one measurement, you cannot say high probability."

Thus, because the third fragment of glass was so small that only its refractive index was measurable, Bradley could opine that there was only a "good probability," not a "high probability," that the third fragment and the glass standard had come from the same source.

¶ 59    Bradley had recovered more than three glass fragments from the clothing and boots–there were plenty more glass fragments–but she chose the largest three, and when she discovered that the third fragment had a refractive index similar to that of the glass standard, she did not test any other glass fragments. Under laboratory procedures, if one found a glass fragment that was similar in all measurable properties to the standard and if none of the remaining

fragments had a greater number of measurable properties, there was no need to go on: "you stop the analysis because one fragment presumably then will lead you to your conclusion."

¶ 60                                     7. *Benjamin McGill*

¶ 61        Benjamin McGill testified he was a patrol officer with the Springfield police. On June 14, 2009, at approximately 1:30 a.m., when the dispatcher radioed him that the capitol police had detained someone near the YMCA who appeared to match the description of the man who reportedly had burglarized the café, McGill and his partner, Dodd, drove to Fourth and Cook Streets to take the man into custody. McGill identified defendant, in court, as the man whom the capitol police had apprehended.

¶ 62        McGill testified that after paramedics finished washing the pepper spray out of defendant's eyes, he and Dodd took defendant to the Sangamon County jail, where they collected his clothing and boots. McGill identified People's exhibit Nos. 15 through 20 as photographs of these items.

¶ 63        The photographs are in the record. They show a pair of black sweatpants–which, as McGill acknowledged on cross-examination, do not appear to have a white stripe; a pair of brown socks; a pair of boots; and a black T-shirt. On the chest of the T-shirt is a red arrowhead, pointing upward, with three barbs on both sides of the head. The arrowhead appears to be inside a red circle, which in turn is inside another red circle composed of dashes. To the right of this red emblem (the wearer's left), in small-case white letters of roughly the same height as the red emblem, is the word "bam," followed by a white period.

¶ 64        McGill testified that after collecting the clothing and boots from defendant, he and Dodd took them to the "ID tech," Lori White, who was still at the scene of the burglary. The items stayed in McGill's and Dodd's custody the entire time until they handed them to White.

¶ 65                                     8. *August Mrozowski*

¶ 66        August Mrozowski, the chef and owner of Augie's Front Burner, testified that in June 2009 the restaurant was open for lunch from 11 a.m. to 2:30 p.m. and for supper from 5 p.m. to 9:30 p.m.

¶ 67        Defendant was an employee of the restaurant in June 2009. Employees clocked in and out on a touch screen, and according to a computer-generated payroll record, defendant worked at the restaurant on June 13, 2009, from 9 a.m. to 12:01 p.m. and from 1:16 p.m. to 3:12 p.m.

¶ 68        Defendant's job duties were to wash dishes and to help with the cleaning. He also was expected to take out the garbage. On the ground around the dumpster, there would have been little particles of glass, Mrozowski assumed.

¶ 69                                     9. *Lori White*

¶ 70        Lori White, a crime-scene technician with the Springfield police department, testified that

People's exhibit Nos. 1 through 9 were photographs she took of the café on June 14, 2009. The photographs are in the record, and several of them show the damaged door. It is a metal door framing a large sheet of what appears to be Plexiglass. A spider-web fracture radiates out from the bottom half of the Plexiglass, which is bowed inward at the bottom, at the center of the fracture (suggesting the pliability of Plexiglass). The bottom edge of the Plexiglass has come out of the door frame and is canted toward the sidewalk. Glittery dust-like fragments from the Plexiglass are sprinkled around the threshold and on the black runner inside the café.

¶ 71      White testified she collected glass samples from the front door and put them in a coin envelope. This was People's exhibit No. 26.

¶ 72      McGill and Dodd brought some clothing to the crime scene, and White sealed the clothing in a package. This was People's exhibit No. 27.

¶ 73      The prosecutor asked White:

"Q. Again, did you keep that all separate from the glass standard and the other items that you had collected?

A. Yes, it was all packaged separately."

White sealed the bags with evidence tape, initialed the tape, and put the bags in a secure locker at the police station.

¶ 74      In addition, White "checked around the broken glass for any signs of hair, clothing, fibers, [and] blood." She found none.

¶ 75      Nor did she find any fingerprints of "comparison quality" on the door, the cash register, or the counter. She lifted a "partial latent print from the inside of the door[,] near the bottom," but the print was too incomplete to compare it to anyone's known prints.

¶ 76                          10. *Ryan Maddox*

¶ 77      Ryan Maddox was on duty on June 14, 2009, at 1:30 a.m., when he heard, over the police radio, that Lincoln Douglas Café had been burglarized. He parked his squad car and patrolled the vicinity of the burglary on foot, looking for anyone who matched the description of the burglar as reported by the dispatcher. He found no one.

¶ 78      Then Maddox heard, over the radio, that the Secretary of State Police had detained someone who matched the description. He got in his squad car and went to Fourth and Cook Streets. There he saw two Secretary of State investigators, who had a man on the sidewalk by the YMCA. The man had been pepper-sprayed. Maddox identified him, in court, as defendant.

¶ 79      Defendant was "[j]ust on his side sitting down in a comfortable position," and "[t]here [were] several bills of currency lying in that same area and spread along the ground," fanned out in "[p]robably [a] two[-] to three-foot spread."

¶ 80      On his sergeant's instructions, Maddox picked up the money and put it in a coin envelope. This was People's exhibit No. 25. The money consisted of "$91 and a Jamaican coin." Specifically, "[t]here were 12 five-dollar bills and 31 one-dollar bills and the Jamaican coin." The Jamaican coin had been lying on the ground next to the United States currency.

¶ 81                              F. People's Instruction No. 10

¶ 82        Without objection by defense counsel, the trial court gave the jury People's instruction No. 10, which listed some factors the jury should consider when weighing the identification testimony of a witness. The instruction read as follows, using the conjunction "or" between the factors instead of "and":

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
> The opportunity the witness had to view the offender at the time of the offense.
>
> *or*
>
> The witness's degree of attention at the time of the offense.
>
> *or*
>
> The witness's earlier description of the offender.
>
> *or*
>
> The level of certainty shown by the witness when confronting the defendant.
>
> *or*
>
> The length of time between the offense and the identification confrontation." (Emphases added.)

¶ 83                              G. The Posttrial Motion

¶ 84        Defendant's posttrial motion asserted the insufficiency of the evidence and reiterated the objection to amending the information. The motion did not mention People's instruction No. 10.

¶ 85                              II. ANALYSIS

¶ 86             A. The Use of "Or" in People's Instruction No. 10

¶ 87        It was incorrect to use the disjunctive conjunction "or" in between the factors in People's instruction No. 10. Instead, the conjunction "and" should have been used. See *People v. Herron*, 215 Ill. 2d 167, 191 (2005). When weighing identification testimony, a jury should consider all the factors together instead of one factor as an alternative to another factor.

¶ 88        As defendant acknowledges, however, defense counsel never objected to People's instruction No. 10. Nor did defendant's posttrial motion mention the instruction. Generally, a defendant forfeits review of an error in the jury instructions in a criminal case unless the defendant objects to the error at trial and reiterates the objection in a posttrial motion. *Herron*, 215 Ill. 2d at 175.

¶ 89        There is an exception to this rule of procedural forfeiture, and defendant invokes the exception. Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) provides that "substantial defects" in jury instructions in criminal cases "are not waived"–that is, review of them is not forfeited–"by failure to make timely objections thereto if the interests of justice require." The

supreme court has interpreted Rule 451(c) as averting forfeiture when Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) would do so. *People v. Bannister*, 232 Ill. 2d 52, 77 (2008). Rule 615(a) averts a forfeiture in either of two circumstances: (1) the evidence is so close that the error might have made a difference in the jury's verdict, or (2) the error is so serious as to make the trial unfair and threaten the integrity of the judicial process. *Herron*, 215 Ill. 2d at 178-79.

¶ 90    For three reasons, defendant argues the evidence was close in this case. First, Maurer never saw the burglar come back out of the café, because Hannah was blocking her view as they crossed the street. Second, Maurer thought the burglar was wearing a FitClub shirt, but defendant was not wearing a FitClub shirt. Third, Maurer did not identify defendant as the burglar until she testified at trial.

¶ 91    We are unconvinced that those three reasons make this a close case. As for Maurer's not seeing the burglar exit the café, we do not understand what difference that makes, given the rest of the evidence. Hannah saw the burglar exit the café. Or, more precisely, as Hannah was crossing the street, walking toward his Humvee, he saw, through the windows of his Humvee, a man "pop up" in front of the café. The burglar would have had to pop up after stooping through the hole he had made in the bottom portion of the door. Maurer and Hannah both watched the burglar walk away from the café, immediately after Hannah saw him exit the café. It was 1:30 a.m., and no one else came onto the scene from the moment Maurer saw the burglar break in to the moment she and Hannah saw him walk away. One could conclude that no one else came onto the scene, because Maurer was watching intently the whole time, and Hannah joined her in keeping watch after he finished locking up Two Brothers.

¶ 92    Maurer and Hannah both saw a black man in black sweatpants and a black T-shirt with red and white lettering. It is true that Maurer thought the burglar was wearing a FitClub shirt and that defendant was not wearing a FitClub shirt, but as Maurer explained in her testimony, she thought the burglar was wearing a FitClub shirt only because his shirt had the same combination of colors as a FitClub shirt: red and white on a black background. So, really, this reference to a FitClub shirt hardly qualifies as a discrepancy.

¶ 93    Except for the thin white stripe on the black sweatpants (the sweatpants had no stripe), defendant was wearing the clothing that Maurer and Hannah described the burglar as wearing, right down to the red and white colors on the black T-shirt, and less than 10 minutes after the burglary, defendant was spotted at the intersection of Fourth and Cook Streets, a few blocks south of the café. Granted, when Hannah drove there at the request of the police, Maurer did not get out of the car and identify defendant as the burglar, but Hannah did so, and the rest of the evidence resoundingly confirms that Hannah's identification was correct.

¶ 94    Not only was defendant's arm sprinkled with what appeared to be glass dust (like the glass dust on the black runner in the café), but after he fled the police and was tackled, money was found on the ground nearby. This money was in the denominations, fives and ones, that Seaver testified he kept in the cash register overnight so as to be able to make change for twenties the next day. When one adds the $91 found on the ground to the two five-dollar bills found on the floor of the café, the sum is $101, quite close to the $100 that Seaver testified he customarily kept in the cash register overnight. On top of that–and this

was one of the most damning pieces of evidence–a Jamaican coin was found among the $91 in currency on the ground: a Jamaican coin similar to the one that Seaver testified was missing from the cash register.

¶ 95 In addition, a trace chemist, Bradley, opined there was a "good probability" that a glass fragment she had recovered from either the clothing or the boots in People's exhibit No. 27 had come from the same source as the glass sample in People's exhibit No. 26, on the basis of the similar refractive indexes and the uncommonness of the type of glass. We know, from other testimony, that the clothing and boots were defendant's and that the glass sample came from the door of the café.

¶ 96 When we consider all this incriminating evidence, we disagree with defendant's characterization of the evidence as close. Rather, the evidence of guilt was quite strong. Consequently, contrary to defendant's argument, the error in People's instruction No. 10 was not plain error. (Defendant does not contend the error was in itself so serious, regardless of the closeness of the case, as to make the trial unfair and threaten the integrity of the judicial process–and *Herron* would not support such a contention. See *People v. Battle*, 393 Ill. App. 3d 302, 311 (2009) (distinguishing *Herron* because the evidence was not closely balanced); *People v. Goné*, 375 Ill. App. 3d 386, 394 (2007) (same)). Absent plain error, review of the error in People's instruction No. 10 is forfeited.

¶ 97 B. The Pretrial Amendment of the Information

¶ 98 The information consisted of one count of burglary, and immediately before *voir dire*, the prosecutor moved to amend the information by adding the phrase "without authority," so as to allege that defendant's entry of Lincoln Douglas Café was unauthorized. Defense counsel objected, and the trial court overruled the objection, allowing the amendment. Defendant argues the court erred by allowing the amendment of the information without holding a new preliminary hearing and without offering him a continuance and an opportunity to plead anew.

¶ 99 On appeal, we ask whether the trial court abused its discretion by allowing the State to amend its information. See *People v. Alston*, 302 Ill. App. 3d 207, 211 (1999). A decision is an abuse of discretion only if it "exceed[s] the bounds of reason and ignore[s] recognized principles of law." (Internal quotation marks omitted.) *People v. Covington*, 395 Ill. App. 3d 996, 1003 (2009).

¶ 100 The cases on which defendant primarily relies are *People v. Thingvold*, 145 Ill. 2d 441 (1991), *People v. Benitez*, 169 Ill. 2d 245 (1996), and *People v. Kincaid*, 87 Ill. 2d 107 (1981). We will discuss those cases, one by one, explaining why they are distinguishable from the present case and why they do not justify reversal of the trial court's judgment.

¶ 101 1. *Thingvold*

¶ 102 In *Thingvold*, 145 Ill. 2d at 446, the information, filed on June 25, 1987, charged the defendant with committing the offense of solicitation (Ill. Rev. Stat. 1985, ch. 38, ¶ 8-1) sometime " 'between the dates of December 1, 1983 and the 30th of April, 1986.' "

(Emphasis omitted.) The defendant filed a pretrial motion to dismiss the information because it failed to allege that he had committed the offense within the three-year period in the statute of limitations (Ill. Rev. Stat. 1987, ch. 38, ¶ 3-5(b)). *Thingvold*, 145 Ill. 2d at 446-47. A portion of the time period that the information alleged–the portion from December 1, 1983, through June 24, 1984–was outside the three-year period of limitation (*id.* at 447), and the supreme court had held, in *People v. Strait*, 72 Ill. 2d 503, 505-06 (1978), that, in order to prosecute a defendant for conduct that occurred outside the statutory period of limitation, the State had to allege and prove facts that tolled the running of the statute of limitations. *Thingvold*, 145 Ill. 2d at 447. The State alleged no such facts in its information. *Id.* at 446.

¶ 103   The appellate court agreed with the defendant that the information was deficient in this respect, but the appellate court concluded that the defect was not " 'fatal,' " because the information " 'was sufficiently explicit to enable [the] defendant to prepare his defense and to apprise him that the last act occurred within the time prescribed by the statute of limitations.' " *Thingvold*, 145 Ill. 2d at 447-48 (quoting *People v. Thingvold*, 191 Ill. App. 3d 144, 147 (1989)).

¶ 104   According to the supreme court, however, the appellate court erred in its analysis of this issue: the appellate court applied the wrong standard of review. *Thingvold*, 145 Ill. 2d at 448. The supreme court explained that there were two standards for reviewing a defective charging instrument, depending on when the defendant acted. If the defendant "attacked" the charging instrument before trial, the charging instrument had to strictly comply with the pleading requirements of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, ¶ 111-3(a)). *Thingvold*, 145 Ill. 2d at 448. If, however, the charging instrument was "attacked for the first time on appeal," all the charging instrument had to do was apprise the defendant of the precise offense charged and do so with sufficient specificity to enable the defendant to prepare his or her defense and, if convicted, to plead the conviction as a bar to future prosecution arising out of the same conduct. *Id.* In short, if the defendant "attacked" the charging instrument for the first time on appeal, the defendant had to show prejudice from the defect in the charging instrument: prejudice in trial preparation or in the invocation of double jeopardy. *Id.*

¶ 105   In *Thingvold*, the defendant attacked the information *before trial*, by filing a pretrial motion to dismiss the information on the ground that it failed to allege conduct occurring within the three-year period of limitation. *Thingvold*, 145 Ill. 2d at 446. Because the defendant filed a pretrial motion attacking the information instead of waiting until his direct appeal to attack the information, the appellate court should have applied the strict-compliance standard, not the prejudice standard. *Id.* at 450.

¶ 106   *Thingvold* is distinguishable in that, unlike the defendant in *Thingvold*, defendant in the present case never filed a pretrial motion attacking the information. See 725 ILCS 5/114-1(a)(8) (West 2010) ("Upon the written motion of the defendant made prior to trial ***[,] the court may dismiss the *** information *** [on the ground that] [t]he charge does not state an offense.") Instead, defendant objected when the State moved to amend the information. By all indications, defendant was perfectly willing to proceed to trial on the defective information. Consequently, the standard of strict compliance is inapplicable to this case.

¶ 107                                    2. *Benitez*

¶ 108        In *Benitez*, 169 Ill. 2d at 246, a grand jury returned an indictment, signed by the foreperson of the grand jury, but the indictment made no mention of the defendant. Attributing this lack of mention of the defendant to clerical error (*id.* at 250), the State's Attorney's office notified the defendant, by letter, that the grand jury had indicted him, and the State's Attorney prepared a "second indictment," unsigned, which accused the defendant of first-degree murder, attempted murder, aggravated battery, and armed violence (*id.* at 247). The State tendered this second indictment to defense counsel during the arraignment. *Id.*

¶ 109        Later, on the second day of trial, after the State began presenting its case in chief, defense counsel became aware that the first indictment–*i.e.*, the real indictment, signed by the foreperson of the grand jury–contained no mention of the defendant. *Benitez*, 169 Ill. 2d at 247-48. Defense counsel alerted the trial court to this problem. He said that he wanted to review the transcript of the grand jury and the original of the indictment, to see if the grand jury had in fact indicted the defendant. In the meantime, he consented to proceeding with the bench trial, but only on the understanding that he " 'was not waiving anything.' " *Id*. at 248.

¶ 110        The bench trial proceeded. The trial court found the defendant guilty of first degree murder and aggravated battery, and later, the court denied the defendant's posttrial motion to vacate his convictions on the ground of the invalidity of the second indictment. *Benitez*, 169 Ill. 2d at 248. According to the grand jury transcript, the grand jury had voted a true bill against the defendant, and hence, the court concluded, the second indictment "was not subject to attack as void." *Id.* at 250. The appellate court agreed with that conclusion. *Id.*

¶ 111        The supreme court disagreed. According to the supreme court, the State had two options by which it could obtain the amendment of an indictment. The State could resubmit the indictment to the grand jury, or the State could move for permission to amend the indictment so as to correct a formal defect (Ill. Rev. Stat. 1991, ch. 38, ¶ 111-5). *Benitez*, 169 Ill. 2d at 254-55. The State had used neither of those options but instead had "arrogated for itself the power to amend the indictment as it saw fit." *Id.* at 255. Consequently, the supreme court held that the second indictment was invalid and that the defendant never was properly charged with an offense. *Id.*

¶ 112        The next question was the remedy. *Benitez*, 169 Ill. 2d at 255. *Thingvold* had established that if a defective charging instrument was "challenged before trial in a motion to dismiss," strict compliance with pleading requirements was required, and the charging instrument had to be dismissed–or if it was not dismissed and the defendant was convicted, the conviction had to be reversed. *Id.* at 258-59. The supreme court had held, in *People v. Gilmore*, 63 Ill. 2d 23, 29 (1976), that if instead of attacking the defective instrument in a pretrial motion, the defendant attacked it for the first time on appeal, the defendant had to show prejudice from the defect, *i.e.*, that the defect had interfered with the preparation or a defense of that it would frustrate the pleading of double jeopardy. *Benitez*, 169 Ill. 2d at 257.

¶ 113        But what if the defendant challenged the charging instrument for the first time in a posttrial motion? The legislature had answered that question by adding subsection (c) to

section 116-2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, ¶ 116-2 (as amended by Pub. Act 86-391, § 1 (eff. Aug. 30, 1989))). *Benitez*, 169 Ill. 2d at 257-58. Subsection (c) incorporated the *Gilmore* standard of prejudice (*Benitez*, 169 Ill. 2d at 258): "A motion in arrest of judgment attacking the indictment, information, or complaint on the ground that it does not charge an offense shall be denied if the indictment, information or complaint apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution out of the same conduct." Ill. Rev. Stat. 1991, ch. 38, ¶ 116-2(c) (now 725 ILCS 5/116-2(c) (West 2010)).

¶ 114      In *Benitez*, the defendant attacked the second indictment in his posttrial motion (*Benitez*, 169 Ill. 2d at 248)–but not *for the first time*. He had attacked it earlier, *during* trial. *Id.* at 247-48. Even so, that was not quite as early as the strict-compliance standard required, *i.e.*, in a pretrial motion. *Id.* at 258-59. So, the supreme court had to decide what to do in that situation. The supreme court held that, "under the unique circumstances of [the] case, [the] defendant [was] not required to show that he sustained prejudice to warrant reversal of his convictions." *Id.* at 259.

¶ 115      *Benitez* is distinguishable from the present case in three ways. First, in *Benitez*, the State amended the indictment unilaterally, without moving for permission to do so, whereas, in the present case, the State moved for permission to amend the information, before trial.

¶ 116      Second, in *Benitez*, the defendant was the party who first raised the defect in the charging instrument, whereas, in the present case, the State is the party which did so, by moving, immediately before trial, to amend the information by adding the qualifier "without authority." Defendant opposed this pretrial motion to amend the information, and afterward, in his posttrial motion, he alleged that the trial court had "erred by allowing the State to amend the Information herein on the day that the trial commenced by adding an element of the offense; to wit: lack of authority." Hence, it would not be strictly accurate to say that defendant "attacked the information" before trial or, indeed, even in his posttrial motion; instead, he attacked the State's motion to correct the defect in the information.

¶ 117      Third, the supreme court has noted that "[its] holding in *Benitez* clearly relied in large part upon the prosecution's misconduct. Due to that misconduct, the defendant was denied an opportunity to object to the deficiencies in the indictment before trial because he was only apprised of the State's improprieties after the trial had begun." *People v. Cuadrado*, 214 Ill. 2d 79, 87-88 (2005). In the present case, by contrast, no prosecutorial misconduct obscured the defectiveness of the information. Defendant in this case "had ample opportunity before trial to object to the [information]," but he did not do so. *Id.* Instead, he objected to the State's pretrial motion to correct the information.

¶ 118                                          3. *Kincaid*

¶ 119      In *Kincaid*, 87 Ill. 2d at 120-21, the preamendment information alleged that the defendant had " 'committed the offense of INDECENT LIBERTIES WITH A CHILD, (CLASS I FELONY), in violation of Chapter 38, Section 11-4 of the Ill. Rev. Stat., 1977, as amended, in that the said defendant being a person of the age of 17 years and upwards, performed a

lewd fondling or touching of [here the State named the alleged victim] with the intent to arouse or satisfy the sexual desires of the defendant.' " *Id.* at 120-21. The missing element was that "the alleged victim was 'a child under the age of sixteen years.' " *Id.* at 121. Immediately before the trial, the State moved to amend the information so as to add that language. *Id.*

¶ 120    In response to the prosecutor's motion to add this new element to the information, defense counsel objected, saying, " 'I don't think it *** gives us time to prepare.' " *Kincaid*, 87 Ill. 2d at 121. The trial court overruled the objection but offered to give defense counsel additional time to prepare–an offer that defense counsel declined, however. *Id.*

¶ 121    On appeal to the supreme court, the defendant argued the trial court had erred by allowing the amendment of the information. *Kincaid*, 87 Ill. 2d at 120. He argued that the omission of the allegation that the victim was under the age of 16 was a "fundamental defect" rather than a "formal defect" and that the original information was therefore void and uncorrectable by amendment. *Id.* at 122-23.

¶ 122    Consequently, the issue was whether the State had the right to amend an information before trial so as to correct a substantive defect (*Kincaid*, 87 Ill. 2d at 123)–and, clearly, the omission of the language that the victim was under the age of 16 was not a formal defect but a substantive defect: it was an omission of an indispensable element of the offense (see Ill. Rev. Stat. 1977, ch. 38, ¶ 11-4). The supreme court observed that, under the common law, the State had a right to amend its information (in contrast to an indictment). *Kincaid*, 87 Ill. 2d at 123. The supreme court was unaware of any statute that had abrogated that common-law right–not even section 111-5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, ¶ 111-5 (now 725 ILCS 5/111-5 (West 2010))), which spoke of correcting formal (as distinct from substantive) defects in a charging instrument. *Kincaid*, 87 Ill. 2d at 122. The supreme court therefore concluded that the State's common-law right still existed. *Id.* at 124. See also *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 518 (1997) ("A legislative intent to abrogate the common law must be clearly and plainly expressed and such an intent will not be presumed from ambiguous or doubtful language.").

¶ 123    Given that the State had a common-law right to amend the information before trial, even to add a missing element, the supreme court considered what should be the procedure for accomplishing such an amendment. The supreme court noted that, "[a]s a practical matter, under present procedure, the State could accomplish results similar to an amendment," simply by dismissing the defective information and, at the time of the dismissal, filing a new complaint, which included the missing element. *Kincaid*, 87 Ill. 2d at 124-25. The new complaint would begin a new case, whereupon "[the] [d]efendant would immediately be taken into custody, a new appearance bond would be set, and a preliminary hearing would be scheduled followed by a new information being filed." *Id.* at 125. But this procedure, the supreme court remarked, would be "expensive" and "inefficient" and could subject the defendant to unnecessary hassle. *Id.*

¶ 124    As an alternative to starting from scratch, the supreme court suggested a better procedure:
          "A better procedure would be to allow the State's Attorney to amend an information to include essential elements of the crime charged only when such amendment is made

-16-

before trial, a prompt preliminary hearing is held to determine probable cause, and the defendant is allowed to plead anew and is afforded a reasonable time to further prepare his defense, which time shall be attributable to the State for [speedy-trial purposes]." *Kincaid*, 87 Ill. 2d at 125.

¶ 125　It is noteworthy that the defendant in *Kincaid* did not receive a second preliminary hearing. Nor, apparently, did he receive an opportunity to plead anew, in the sense of the trial court's explicitly asking him if he wanted to plead anew in view of the State's amendment of this information. Nevertheless, the supreme court found no cause for reversal. The supreme court reasoned: "[T]here had already been a prompt preliminary hearing to determine probable cause, at which hearing the age of the victim was indicated (making it unnecessary to again hold a preliminary hearing following the filing of the amended information), and *** the court offered the defendant 'additional time within which to prepare' but the offer was refused." *Id.* at 125-26.

¶ 126　As for allowing the defendant to plead anew, the supreme court did not explicitly say how that procedure had been fulfilled in his case, but one can read between the lines. In its discussion of the State's common-law right to amend its information, the supreme court said: " 'If the amendment can give occasion to a *new defense*, the defendant has leave to change his plea; if it can make no alteration as to the defense, he does not want it.' " (Emphasis in original.) *Kincaid*, 87 Ill. 2d at 123 (quoting *Truitt v. People*, 88 Ill. 518, 520 (1878)). Evidently, the amendment gave no occasion to a new defense, and hence the defendant did not want leave to change his plea–or else, surely, he would have requested such leave.

¶ 127　Thus, *Kincaid* stands for the proposition that if, before trial, the States moves to amend the information so as to add a missing element and the defendant objects, the trial court may allow the amendment but should hold a new preliminary hearing (unless probable cause as to that element already was established in the previous preliminary hearing), and the court should allow the defendant a reasonable amount of additional time to prepare for trial if the defendant wishes additional time.

¶ 128　Quoting *Kincaid*, 87 Ill. 2d at 125, defendant argues that "[a] prosecutor may amend an information to include essential elements of the crime charged 'only when such amendment is made before trial, a prompt preliminary hearing is held to determine probable cause, and the defendant is allowed to plead anew and is afforded a reasonable time to further prepare his defense.' " Defendant argues that because the trial court in this case did none of those things–because the court did not hold a new preliminary hearing to determine probable cause, did not give him an opportunity to plead anew, and did not offer him a continuance–the court's allowance of the State's pretrial motion to amend the information by adding a missing element is reversible error.

¶ 129　Actually, the supreme court never said, in *Kincaid*, that the failure to do all three of those things necessarily would require reversal of the conviction. In fact, it is readily inferrable that all three of those things are not the *sine qua non* of allowing a pretrial motion to amend the information, because the State in *Kincaid* did not do all three of those things and nevertheless the supreme court upheld the conviction. *Kincaid*, 87 Ill. 2d at 125-26. Let us consider the three things one by one.

¶ 130                                      a. A New Preliminary Hearing

¶ 131        The trial court in *Kincaid* did not hold a new preliminary hearing after allowing the State to add the missing element to the information, but the supreme court concluded that, under the circumstances, it was permissible to dispense with a new preliminary hearing, because probable cause to support the missing element (namely, the victim's being under the age of 16) already had been established in the original preliminary hearing. *Kincaid*, 87 Ill. 2d at 124-26.

¶ 132        In the present case, the missing element was the qualifier "without authority": defendant's entry of the café was without authority. In the preliminary hearing, which was held on July 2, 2009, did the State establish probable cause to believe that defendant's entry of the café had been without authority? To answer that question, let us first be clear on what "probable cause" is. "[W]hether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. [Citation.] Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false. [Citation.]" (Emphasis omitted.) (Internal quotation marks omitted.) *In re Detention of Hardin*, 238 Ill. 2d 33, 45 (2010).

¶ 133        Now let us apply that discussion of probable cause from *Hardin* to Maddox's testimony in the preliminary hearing. Maddox testified that, around 1:30 a.m., two witnesses heard the shattering of glass and saw a man crawling through the bottom portion of the door of the café and that, shortly afterward, these witnesses identified defendant as the man. At the risk of stating the obvious, an authorized entry of a café is not normally accomplished by breaking the glass of the door at 1:30 a.m. and crawling inside through the hole one has made. A reasonable person, using common sense, would believe the entry was unauthorized. Thus, in the preliminary hearing that the trial court previously held, probable cause to support the element of an unauthorized entry already was established, making it unnecessary to hold a new preliminary hearing.


¶ 134                                   b. Allowing the Defendant To Plead Anew

¶ 135        Although the supreme court said, in *Kincaid*, that part of the "better procedure" would be to "allow[ ] [the defendant] to plead anew" after granting the State's pretrial motion to amend the information (*Kincaid*, 87 Ill. 2d at 125), it does not appear that the trial court in that case asked the defendant if he wanted to plead anew (*id.* at 121), and nevertheless the supreme court upheld his conviction (*id.* at 126). The supreme court must have meant that the trial court should allow the defendant to plead anew if the defendant requested to do so. After all, who is in a better position than defense counsel to know whether "the amendment can give occasion to a new defense"? (Emphasis and internal quotation marks omitted.) *Kincaid*, 87 Ill. 2d at 123. The defendant in *Kincaid* never requested to change his plea. Nor did defendant in the present case.


¶ 136                              c. A Reasonable Amount of Time for Further Preparation

¶ 137    According to *Kincaid*, the third thing the trial court should do, after granting the State's motion to amend the information so as to add a missing element, is to "afford[ ] [the defendant] a reasonable time to further prepare his defense." *Kincaid*, 87 Ill. 2d at 125.

¶ 138    We do not understand the supreme court to be saying, however, that the trial court must offer a continuance to the defendant *sua sponte*, without the defendant's even requesting one (although that is what the trial court did in *Kincaid*, after defense counsel complained that the amendment of the information on the date of trial did not give him "time to prepare" (*id.* at 121). We do not see how a party can reasonably complain of not having received a continuance unless the party requested one. See *People v. Coleman*, 49 Ill. 2d 565, 570 (1971) ("He did not seek a continuance after the amendments were allowed for the purpose of further preparation."); *People v. Ross*, 395 Ill. App. 3d 660, 672 (2009) ("[D]efense counsel did not ask for a continuance when the trial court allowed the State to amend the indictment."); *People v. Wilder*, 325 Ill. App. 3d 987, 995 (2001) ("[W]hether the trial court should have granted a one-day continuance is not properly before this court, since [the] defendant never requested such a continuance. Moreover, to require the trial court to grant, *sua sponte*, a continuance for a period of time not requested is beyond the duty of the court and shifts the duties of the defense attorney to the trial judge.")

¶ 139    Therefore, we interpret *Kincaid* as saying that, after granting the State's motion to add an omitted element to the information, the trial court should "afford[ ] [the defendant] a reasonable time to further prepare his defense" *if the defendant requests additional time*. *Kincaid*, 87 Ill. 2d at 125. In the present case, defendant never made such a request. Further, it strikes us as highly unlikely that any amount of additional preparation time would have enabled defendant to prove that the owners of Lincoln Douglas Café had authorized him to break into the café.

¶ 140    Assuming that, on some basis that would be difficult to imagine, defendant did wish to contest his lack of authority to enter the café (as opposed to his being the burglar), the lack of authority already was implicit in the preamendment text of the information, and so, in the preparation of his defense, he could not convincingly claim to be surprised or misled. The preamendment information alleged that he entered the café "with the intent to commit therein a theft." An entry with the intent to commit a theft is, *ipso facto*, an entry without authority. *People v. Stager*, 168 Ill. App. 3d 457, 459-60 (1988); *People v. Boose*, 139 Ill. App. 3d 471, 473 (1985). Defendant would not likely argue to the trial court that he had authority from the owners to steal from them.

¶ 141    In sum, we conclude, on the authority of *Kincaid*, 87 Ill. 2d at 123-24, that the State had a common-law right to amend its information, before trial, so as to add a missing element and that the trial court allowed the amendment in a manner "consistent with the orderly conduct of judicial business, with the public interest, and with private rights" (internal quotation marks omitted) (*Long v. People*, 135 Ill. 435, 441 (1890), *cited in Kincaid*, 87 Ill. 2d at 123-24). A new preliminary hearing was unnecessary because probable cause to believe that defendant's entry of the café was unauthorized already had been established in the original preliminary hearing. Defendant never requested either a continuance or an opportunity to plead anew. In short, defendant has "shown no prejudice as a result of the amended allegation but has asserted the mere technical objection thereto." *Coleman*, 49 Ill.

2d at 570.

¶ 142                                    C. The Sufficiency of the Evidence

¶ 143     Defendant contends that the State failed to prove him guilty beyond a reasonable doubt of the charge of burglary. We already have addressed many of the points he raises in support of his contention that the evidence is insufficient to support his conviction. Under the heading of the instructional error, we have explained why we consider the evidence of guilt to be strong.

¶ 144     We would like to discuss, however, some representations that defendant makes about Bradley's testimony in the course of his argument that the State failed to prove him guilty. We do not regard his account of her testimony to be fair or accurate. Defendant says:

> "Concerning the circumstantial evidence, a small glass shard which may have been recovered from the clothing or boots of Darnell Smith (or may not have been–the expert [(Bradley)] who analyzed the glass shard could not say for sure) may have come from the glass that shattered from the door of the Lincoln Douglas Café. Or it may not have originated from that door; the expert could not say for sure."

¶ 145     Initially, we note that, in the quoted passage, defendant provides no citation to the record. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Argument, which shall contain the contentions of the appellant ***, with citation of *** the pages of the record relied on.").

¶ 146     Further, the quoted passage contains two statements that strike us as (unintentionally) misleading. First, the passage states that the glass shard–by which defendant clearly means the third glass fragment–"may not have been" "recovered from [his] clothing or boots" and that Bradley "could not say for sure" whether it was recovered from his clothing or boots. On the contrary, Bradley testified that the third glass fragment came from either the clothing or the boots in People's exhibit No. 27; she recovered the glass fragment (among other glass fragments) by scraping down the clothing and picking in the treads of the boots. Her testimony was uncontradicted and unrebutted. We know, from McGill's and White's testimony, that defendant was wearing this clothing and these boots when the police arrested him.

¶ 147     So, it is simply untrue that Bradley was unable to "say for sure" that the third glass fragment came from defendant's clothing or boots. She could not say whether the fragment came from the clothing or whether it came from the boots, given that the clothing and boots had been delivered to her in the same package, but she could say that the fragment came from either the clothing or the boots–which indisputably belonged to defendant.

¶ 148     The second statement is perhaps less misleading than the first, but it is nevertheless misleading. Defendant says that, according to Bradley's testimony, the third glass fragment "may" or "may not have originated from [the] door [of the café]." Actually, we know, from White's testimony, that the glass standard came from the door of the café, and Bradley testified there was a "good probability" that the third glass fragment and the glass standard had a common origin. Granted, Bradley could not say "for sure" that the two had a common origin, but a "good probability" is more than "may" or "may not."

¶ 149    When we regard Bradley's scientific analysis and all the other evidence in a light most favorable to the prosecution, we are unable to say it would be impossible for a rational trier of fact to find the elements of burglary to be proved beyond a reasonable doubt. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Consequently, we hold that the evidence is sufficient to support the conviction.

¶ 150                                   III. CONCLUSION

¶ 151    For the foregoing reasons, we affirm the trial court's judgment. We award the State $50 in costs against defendant.

¶ 152    Affirmed.